Filed 8/8/25  In re S.D. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for
publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication
or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re S.D., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>L.O.,<br><br>    Defendant and Appellant. | E085242<br><br>(Super.Ct.No. INJ2000350)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Elizabeth Tucker,

Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

Pamela Rae Tripp for Defendant and Appellant.

Minh C. Tran, County Counsel, Teresa K.B. Beecham and Larisa R-McKenna,

Deputy County Counsel, for Plaintiff and Respondent.

## I.

## INTRODUCTION

Defendant and appellant L.O. (PGM) is the paternal grandmother of 10-year-old S.D., nine-year-old A.D., and seven-year-old J.D. PGM appeals from the juvenile court's order reducing her visitation as to all three children.[1] PGM contends substantial evidence did not support the court's reduction of her visits as being in the children's best interests. We disagree and affirm the order.

## II.

## FACTUAL AND PROCEDURAL BACKGROUND

The family initially came to the attention of Riverside County Department of Public Social Services (DPSS) in October 2020 when an immediate response referral was received by Nevada child protective services. Then four-year-old A.D. was found wandering a hotel unsupervised with a burn on the bottom of her foot and reported Mother had burned her. All three children were taken into protective custody by Nevada child protective services. The parents lived in Desert Hot Springs, California at the time. The Nevada juvenile court found it contrary to the children's welfare to remain in the parents' home, removed them from parental custody, and granted a 30-day visit with PGM in California.

---

[1] J.D. (Mother) and T.M. (Father) are not parties to this appeal.

2

The children were formally detained in November 2020 and a Welfare and Institutions Code[2] section 300 petition was filed in December 2020. On January 28, 2021, the juvenile court found true the allegations pursuant to section 300, subdivisions (a), (b), (e), and (g). The court declared the children dependents of the court, removed them from Mother's custody, granted Mother reunification services, and maintained them in Father's care under family maintenance services contingent on allowing the children to reside with PGM.

On February 4, 2021, an immediate response referral was received after law enforcement found two separate baggies containing methamphetamine within Father's home, as well as uninhabitable living conditions. The children were in Father's care at the time and released to the maternal grandfather and Mother, who was not present in the home at the time of the search. Father was arrested on charges related to child endangerment and felon in possession of narcotics while armed. A section 387 supplemental petition was thereafter filed. Father's family maintenance services were revoked and the court ordered the paternal great-aunt to be assessed for placement of the children.

On May 17, 2021, PGM filed a section 388 petition to change the court order. PGM requested the court to place the children in her care. The court denied the request. PGM filed another section 388 petition on June 18, 2021, requesting unsupervised and

---

[2] All future statutory references are to the Welfare and Institutions Code unless otherwise stated.

overnight visits with the children, stating that she had not previously allowed unauthorized contact of the children with Father.

On June 29, 2021, after the court heard arguments from the parties, the court ordered PGM to have reasonable supervised visitation. The court, however, denied PGM's request for de facto parent status, as well as unsupervised, overnight and weekend visits with the children. On this same day, the court held a jurisdiction hearing regarding the section 387 supplemental petition. The court removed the children from Father's custody and adjudged the children dependents of the court under section 387. The court ordered reunification services for Father, vacated the previously scheduled review hearings, and reset a review hearing for both parents.

On July 28, 2021, the juvenile court authorized family maintenance services for Mother when deemed appropriate, as well as increased unsupervised visits for Mother. Father's in-person visits were suspended due to his incarceration and he was granted supervised telephone visits with the children. The children were returned to Mother's care under family maintenance services on December 14, 2021.

On February 23, 2022, PGM filed another section 388 petition, requesting unsupervised visitation because Mother had obtained custody and was not allowing visits with PGM. The court set a hearing and ordered DPSS to attempt to solve the issue and for the children's counsel to "find out what the children want." On May 3, 2022, the court denied PGM's request to have unsupervised visits with the children.

4

On June 14, 2022, the juvenile court terminated Father's services, and granted sole physical and legal custody of the children to Mother and terminated the dependency.

A detention hearing on a new section 300 petition filed May 21, 2023 was held on June 1, 2023. The court removed the children from parental custody, ordered supervised visitation to PGM a minimum of two times per month for one hour with authorization to increase, and set a jurisdictional hearing.

On July 24, 2023, PGM filed a declaration requesting placement of the children, noting Father wanted the children placed in her care, and attached a "Power of Attorney for Care and Custody" and Temporary Guardianship Agreement.

At the jurisdiction hearing held on July 31, 2023, the court found true the allegations in the amended petition filed July 18, 2023, ordered reunification services to Mother, and set a review hearing.

On September 11, 2023, PGM filed another section 388 petition, requesting the children be placed in her care. She claimed that the children were no longer in relative placement with the paternal great-aunt and were in a foster home and that she had formed a bond with the children. The court denied the motion on September 21, 2023, for failing to state a change of circumstances or new evidence.

PGM also filed a De Facto Parent Request and a De Facto Parent Statement on October 13, 2023. PGM also filed a Relative Information form on October 23, 2023. The juvenile court denied the De Facto Parent Request on November 7, 2023.

On December 26, 2023, PGM filed another section 388 petition, stating DPSS had removed the children from the paternal great-aunt and that she was in the process of being approved as a relative resource family member. PGM wanted the visitation order amended, noting "I have been in there life since they were born. I have been in there life through this Dependency case too." However, the attachment to the request stated PGM was asking for the children to be placed in her home.

DPSS filed an addendum report on January 26, 2024, stating PGM had recently caused a seriously detrimental environment in that she had endangered A.D.'s safety by taking her to an unsafe home at 2:00 a.m. to retrieve a puppy and exposing her to gun fire. Specifically, PGM stated that the homeowner came out of the home with a shot gun and fired three shots in their direction. PGM took cover, left and called law enforcement. PGM also brought the children into her care without notifying DPSS and with full knowledge that she had been denied placement by DPSS, had frequent verbal arguments and physical altercations in the presence of the children, and was evasive and refused to allow DPSS contact with the children while coaching the children to make false sexual abuse allegations. In addition, PGM had displayed erratic behavior and sent several texts accusing DPSS as "treating her like a criminal and 'drug addict.' " DPSS had asked PGM to drug test due to concerns regarding PGM having to drug test in a prior dependency, her refusal to drug test in this case, and the family court rejecting her documents filed in support of providing legal guardianship to the children. Mother had also expressed concerns regarding PGM's ability to parent the children.

6

On January 31, 2024, the court denied PGM's section 388 petition, however, the court ordered visitation for PGM twice per month for two hours, supervised by DPSS or designee.

On March 18, 2024, PGM filed another section 388 petition, requesting 12 visits that were denied from September to February 2024, and four hours of unsupervised visits. The court denied the section 388 petition on March 19, 2024.

On May 16, 2024, PGM filed another section 388 petition, requesting placement of the children. She noted that she had been approved as a resource family and was in the criminal exemption phase. The court denied the petition, explaining, "Request does not state new evidence and is trying to avert RFA process. [PGM]'s request was previously addressed in court."

At the status review hearing held on July 16, 2024, the court terminated services to Mother and set a section 366.26 selection and implementation hearing, along with a section 366.3 review hearing.

DPSS's report filed November 7, 2024, noted the children were originally placed with the great paternal aunt, however on August 28, 2023, DPSS discovered that the great paternal aunt's water and electricity were shut off and she had taken the children to live with PGM who was not cleared to have the children in her home. The children were moved to a foster home on September 9, 2023. On October 16, 2024, the children stated they loved staying with the caregiver and did not want to leave the placement. The caregiver reported PGM would ask for visits at the last minute and would cancel minutes

before the visits. During one visit where PGM did not appear due to lack of gas money, PGM spoke to A.D. by phone and caused A.D. to cry by blaming the caregiver for the missed visit, and then guilted the caregiver into providing gas money and having the visit. The caregiver also stated PGM would make promises to the children that they would be going home with her, and spent most of her time with A.D. while ignoring the boys. Although the social worker spoke with PGM to correct the behaviors, on October 16, 2024, the caregiver reported that PGM continued to make promises to the children that they were going home with her and that the day after visits with PGM A.D. would be in a bad mood, make statements about hurting her brothers and herself, and would get in fights with her brothers. DPSS also noted that all three children showed concerning behaviors and aggressiveness and requested for them to be evaluated for Wraparound services. DPSS sought to reduce PGM's visits with the children.

The Court Appointed Special Advocates (CASA) reported the caregiver states the last visit with PGM was October 2024 because she had been telling A.D. she would be taking her home soon, and that A.D.'s attitude and behaviors would become unbearable after the visits as she did not listen to her, threw tantrums, and hit the other children. The CASA also stated that the children appear to love their caregiver, sought her attention and comfort, and appeared very comfortable in the caregiver's home.

At the section 366.3 hearing held on November 13, 2024, the children's counsel submitted to reducing PGM's visits and requested to suspend the Zoom visits. The CASA representative was present, and the juvenile court noted that the representative

8

was in agreement that the "visits with grandma aren't very healthy at least as to A[.D.]." The court ordered visitation with PGM reduced to one time per month for one hour, supervised by DPSS or designee, and suspension of Zoom visits, finding the visits not to be in the best interests of the children. PGM timely appealed.

III.

DISCUSSION

PGM argues there was insufficient evidence to support the court's order reducing her visits with the children as it was not in the children's best interests. We disagree.

Visitation by grandparents is governed by statute. (*In re Marriage of Harris* (2004) 34 Cal.4th 210, 219.) A grandparent does not have an absolute right to visit a dependent child, only the right to have the juvenile court consider whether such visitation shall occur. (*In re J.P.* (2019) 37 Cal.App.5th 1111, 1118 (*J.P.*); *In re J.T.* (2014) 228 Cal.App.4th 953, 962.) "If the court has ordered removal of the child from the physical custody of the child's parents pursuant to Section 361, the court shall consider whether the family ties and best interest of the child will be served by granting visitation rights to the child's grandparents." (§ 361.2, subd. (i); see Cal. Rules of Court, rule 5.695(a)(7)(C); see also § 16507, subd. (a) [Family reunification services provided by social services agency "shall include a plan for visitation of the child by his or her grandparents, where the visitation is in the best interests of the child and will serve to maintain and strengthen the family relationships of the child."].)

9

The juvenile court has authority to make "any and all reasonable orders" to promote the child's best interest (§ 362, subd. (a)), including fashioning appropriate visitation orders. (*In re Kayla W.* (2017) 16 Cal.App.5th 409, 418; *In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180.) Whether, and under what conditions, grandparental visitation occurs is within the juvenile court's discretion. When determining whether to authorize visits by grandparents, the court's primary criteria is whether the best interest of the child will be served by such visits. (§ 361.2, subd. (i); *In re J.P.*, *supra*, 37 Cal.App.5th at p. 1118 [Juvenile court may order visits with grandparents "if it is reasonably related to [the child's] care and is in his [or her] best interest."].) The juvenile court can suspend or deny visitation with any relative whose conduct is detrimental to the child's emotional and/or physical well-being. (*In re F.P.* (2021) 61 Cal.App.5th 966, 973 (*F.P.*); *In re T.M.* (2016) 4 Cal.App.5th 1214, 1219-1220; *In re Valerie A.* (2007) 152 Cal.App.4th 987, 1005; see § 362.1, subd. (a)(1)(B) ["No visitation order shall jeopardize the safety of the child."].)

The juvenile court's visitation orders are reviewed for abuse of discretion. (*In re J.P.*, *supra*, 37 Cal.App.5th at p. 1119; *In re J.N.* (2006) 138 Cal.App.4th 450, 459.) "The abuse of discretion standard warrants that we apply a very high degree of deference to the decision of the juvenile court." (*J.N.*, at p. 459.) We determine whether the order exceeded the bounds of reason and, in so doing, we cannot substitute our judgment for that of the juvenile court. (*In re Caden C.* (2021) 11 Cal.5th 614, 641; *In re Stephanie M.* (1994) 7 Cal.4th 295, 318-319.)

10

A juvenile court's findings that visitation would be detrimental to the child are reviewed for substantial evidence.  (*In re R.M.* (2025) 111 Cal.App.5th 119; *In re F.P.*, *supra*, 61 Cal.App.5th at p. 973.)  "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and ' "substantial" proof of the essentials which the law requires in a particular case.' "  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006.)  "Our role in conducting a review for sufficiency of the evidence is limited.  We must review the entire record in the light most favorable to the juvenile court's order and draw all reasonable inferences from the evidence that support it.  We may not resolve conflicts in the evidence, reweigh the evidence, or second guess the juvenile court's express or implied determinations regarding the credibility of witnesses."  (*In re R.M.*, *supra*, 111 Cal.App.5th 119; accord *In re N.S.* (2020) 55 Cal.App.5th 816, 847; *In re K.B.* (2015) 239 Cal.App.4th 972, 979.)

Here, the record contains substantial evidence to support the juvenile court's finding of detriment.  PGM had an extensive history of disrupting the children's lives through her visitation.  PGM had recently caused a seriously detrimental environment in that she had endangered A.D.'s safety by taking her to an unsafe home at 2:00 a.m. to retrieve a puppy and exposing her to gun fire.  PGM also brought the children into her care without notifying DPSS and with full knowledge that she had been denied placement.  PGM also had frequent verbal arguments and physical altercations in the presence of the children, was evasive and refused to allow DPSS contact with the children while coaching the children to make false sexual abuse allegations, and refused

11

to drug test despite DPSS's concerns.  In addition, PGM had displayed erratic behavior and sent several texts accusing DPSS as "treating her like a criminal and 'drug addict.' " DPSS also had the family court reject her documents filed in support of providing legal guardianship to the children and Mother had expressed concerns regarding PGM's ability to parent the children.

PGM had also allowed the paternal great-aunt to move in with her and the children after the aunt's water and electricity were shut off, despite knowing she was not cleared to have the children in her home.  The caregiver reported PGM would ask for visits at the last minute and would cancel minutes before the visits, and that during one visit where PGM did not appear due to lack of gas money, PGM spoke to A.D. by phone and caused A.D. to cry by blaming the caregiver for the missed visit.  The caregiver also stated PGM would make promises to the children that they would be going home with her, and spent most of her time with A.D. while ignoring the boys.  PGM continued to have inappropriate behaviors with the children, despite DPSS's attempts to correct the behaviors.  Moreover, day after visits with PGM A.D. would be in a bad mood, make statements about hurting her brothers and herself, and would get in fights with her brothers.  The CASA representative corroborated the caregiver's statements, and also noted the children appeared to love their caregiver, sought her attention and comfort, and appeared very comfortable in the caregiver's home.  The children also reported to DPSS that they loved staying with the caregiver and did not want to leave the placement. Although not dispositive, a child's own wishes and statements as reflected in the social

12

worker's reports are strong evidence the juvenile court may consider when deciding whether relative visits would be detrimental to the child's well-being. (Cf. *In re I.E.* (2023) 91 Cal.App.5th 683, 694 [child's wishes, though not determinative, "may be highly relevant evidence when determining whether termination of parental rights will be detrimental to the child"].)

Given the nature of PGM's disruptive behaviors with the children and the children's behavior after visits with PGM, it was reasonable for the juvenile court to conclude PGM's visits caused the children's dysregulated and aggressive behavior and was detrimental for the children. Nevertheless, the juvenile court did not deny PGM visitation altogether, but allowed PGM to have visitation once a month for one hour in a supervised setting, similar to the visitation order made for Mother.

From the above evidence, the juvenile court could reasonably conclude PGM's visits with the children was detrimental and in their best interest to reduce visits with PGM. Considering the substantial evidence that visits with PGM were detrimental to the children's physical or emotional well-being, we find the juvenile court's order that PGM's visits be reduced was not an abuse of discretion.

IV.

DISPOSITION

The juvenile court's November 13, 2024, visitation order as to PGM is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

CODRINGTON
Acting P. J.

We concur:


FIELDS
J.


RAPHAEL
J.

14